**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph GIRONDA, John Heckens, John
Speiss, and John Balzano,
Defendants-Appellants.**

**Nos. 83–2796, 83–2827, 83–2828
and 84–1389.***

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 24, 1985.

Decided April 1, 1985.

---

* All appellants were tried together. Each filed a separate appeal, and the appeals were consoli- dated for oral argument.

Mary L. Mikva, Patrick A. Tuite, Ltd., Kenneth N. Flaxman, Donald V. Morano, Chicago, Ill., for defendants-appellants.

Ted S. Helwig, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

After a jury trial, defendants John Balzano, Joseph Gironda, John Heckens, and John Speiss were convicted of conspiring to steal money from the Continental Bank (Continental) and the First National Bank of Chicago (First National) in violation of 18 U.S.C. § 371. Because defendants conspired to steal money and property having a value exceeding $100, the district court imposed felony and not misdemeanor sentences. The jury also convicted defendants Balzano, Gironda, and Heckens of violating 18 U.S.C. § 924(c)(2), which prohibits the unlawful carrying of a firearm during the commission of a felony. The jury acquitted the same three defendants, however, on the charge that they violated 18 U.S.C. § 924(c)(1) by using a firearm to commit a felony. Defendants appeal their convictions.

## I. The Facts

Defendants' conspiracy to wire funds from Continental and First National into accounts owned or controlled by them began in February 1982 with a meeting between defendant Heckens and two unindicted coconspirators. The two unindicted coconspirators, Felipe Ruiz and Joseph Nichols, maintained a painting contractor partnership, and John Heckens had employed them to perform certain renovation work for him. In late February 1982, Heckens met with Ruiz and Nichols to discuss the work, and, at this meeting, Heckens mentioned that he had unlawfully transferred $65,000 by wire from a north suburban bank with the assistance of a woman whom he knew in the computer room. Ruiz then informed Heckens that he knew two people who worked in computer rooms at different banks and said that he would speak to them about engaging in a wire transfer.

In early March, Heckens again met with Ruiz and Nichols. At this meeting, Ruiz was accompanied by Ishmael Velazquez, his brother-in-law, who worked in the computer room at Continental. After meeting Velazquez, Heckens stated that, with Velazquez' help, he wanted to transfer five or six million dollars to various accounts. Velazquez agreed to help, and, among other things, he drew a diagram for Heckens explaining how to execute a wire transfer. Also, at this meeting, the four discussed the manner in which the proceeds of the wire transfer would be divided and agreed that Ruiz, Nichols, and Velazquez would take half and Heckens and his group would take the other half.

The same individuals met two more times in March to discuss the details of their plan. Although Nichols was not present at the first of these meetings, he did attend the second. During the second meeting, Heckens gave Velazquez certain information pertaining to the accounts into which the funds were to be transferred. With respect to one of these accounts, Heckens gave Velazquez a check bearing the name and account number.

In late March or early April, Heckens, Ruiz, Nichols, and Velazquez met with defendants Balzano and Gironda. At this meeting, Heckens, Balzano, and Gironda took Velazquez aside and told him that he needed to move more quickly with the transfer scheme. Specifically, Balzano informed Velazquez that people were putting pressure on him and told him that if he was in trouble so was Velazquez. Velazquez then agreed to conduct a $10,000 test run and telephone Ruiz with the results. At this time, however, Velazquez decided that he did not want to continue with the conspiracy and lied to Ruiz about the test run. Despite the fact that he never performed the transfer, he told Ruiz that the transfer attempt had created problems, prompting bank security guards to interview him.

At the next meeting, attended by Heckens, Ruiz, Nichols, Balzano, and Gironda, Gironda told Ruiz that he thought that Velazquez was not going to perform the transfer. They agreed that Ruiz should meet with his other contact in a bank computer room, Charles Geiger at First National. Nevertheless, Velazquez met with various of the conspirators two more times in April. At the first meeting, not attended by Balzano or Gironda, Heckens told Ruiz that there was going to be trouble if Velazquez did not perform the transfer. At the second meeting, Velazquez again agreed to perform a test run and to inform Ruiz of the results. As before, Velazquez did not perform the transfer. Nonetheless, he told Ruiz that the run had been unsuccessful and that, because of the problems with the test runs, he wanted to withdraw from the conspiracy. Ruiz relayed this information to Heckens, and Velazquez had no further contact with any defendants.

During the months of April and May, Ruiz spoke frequently with Heckens about the possibility of using Geiger at First National to wire funds out of the bank. In late May, Nichols received a phone call from Gironda. According to Ruiz, Gironda told Nichols that, if Ruiz and Velazquez did not follow through with the scheme, they were going to end up dead in the trunk of a car. As a result of this threat, Ruiz moved out of his residence, which he shared with Nichols, and had no further contact with defendants until he began cooperating with the Government.

The Government became aware of the conspiracy through a somewhat unrelated course of events. As stated previously, Ruiz performed certain renovation work for Heckens throughout the initial stages of the conspiracy. According to Ruiz, he attempted unsuccessfully, on many occasions, to secure payment for his work from Heckens. He further testified that, after one of the meetings previously discussed, he accompanied Heckens to his car where Heckens gave him an envelope containing certain Peat, Marwick and Mitchell checks. Heckens told him that the checks were stolen from a mail room, but that Ruiz had at least a week within which to cash them before the theft would be discovered. Ruiz attempted to cash one of the checks and, as

a result, on June 30, 1982, was interviewed by a United States Postal Inspector about the check. During this interview, Ruiz confessed his involvement in the conspiracy and agreed to cooperate with the Government.

In cooperation with the Government, Ruiz telephoned Heckens and agreed to introduce him to Charles Geiger. Heckens told Ruiz that a friend who had five different bank accounts that could be used to float money back and forth would accompany him to the meeting with Geiger and Ruiz. On August 5, 1982, Heckens and defendant Speiss met with Ruiz and two Postal Inspectors posing as Geiger and Geiger's girlfriend. At this meeting, Heckens agreed to pay "Geiger" $2,000 as earnest money in return for Geiger's agreement to transfer $400,000. Heckens told the Postal Inspector impersonating Geiger that, to facilitate the transfer, he should use one of Speiss' bank accounts to receive the funds. In accordance with these instructions, defendant Speiss turned over a check to the Inspectors, which bore the account number of the account designated to receive the funds.

Ruiz postponed further meetings with defendants until August 16, 1982, when he agreed to meet with Speiss at a building site to discuss renovation work. Ruiz testified that when he arrived at the building, Heckens and Speiss took him inside. According to Ruiz, defendants Balzano and Gironda arrived shortly thereafter and threatened to kill Ruiz for failing to follow through with the wire scheme. Although the jury acquitted defendants on the charge of using a gun in connection with this incident, Ruiz testified that defendants Balzano and Gironda committed various acts of physical violence against him. As a result of defendants' intimidation tactics, Ruiz agreed to arrange a meeting with Geiger.

The next day, August 18, 1982, Ruiz informed Heckens and Speiss that Geiger had agreed to meet them the following morning at the Lincoln Park Zoo. On August 19, 1982, the Postal Inspectors set up surveillance at the zoo. Shortly thereafter, defendants Balzano and Gironda arrived at the zoo, and the Inspectors arrested them. When arrested, defendant Balzano was carrying a pistol hidden in the waistband of his pants. At the same time, the Inspectors also seized a briefcase, located in the car that Balzano and Gironda had driven to the zoo, which contained numerous documents connecting the other defendants to the conspiracy.

On August 19, 1982, Postal Inspector Michael Aiesi arrested defendant Speiss. According to Inspector Aiesi, he advised Speiss of his *Miranda* rights at the time of the arrest at Speiss' home and again at the main post office where he took Speiss immediately following his arrest. Inspector Aiesi testified that Speiss signed a form waiving his rights and told Inspector Aiesi that he wanted to talk. During this conversation, Speiss confessed his involvement in the conspiracy.

Inspector Aiesi further testified that Speiss called him in mid-October to arrange a meeting. At this meeting, according to Inspector Aiesi, he again informed Speiss of his *Miranda* rights. In response, Speiss executed a handwritten statement in which he stated that his attorney did not know about the meeting and that he did not want his attorney to know about it. During this meeting, Speiss again confessed his involvement in the conspiracy.

## II. The Proceedings Below

On September 17, 1982, a federal grand jury returned a three-count indictment against the defendants. Count I charged all four defendants with conspiracy to steal $400,000 from the First National Bank of Chicago in violation of 18 U.S.C. § 371. Count II charged defendant Gironda with violating 18 U.S.C. § 924(c)(1) by using a gun in connection with the August 17, 1982, incident. Count III charged defendant Balzano with violating 18 U.S.C. § 924(c)(2) by unlawfully carrying a gun in the commission of a felony.

The grand jury returned a superseding indictment on February 4, 1983. Count I of the superseding indictment charged the

four defendants with conspiracy to steal money and property from different banks. Although paragraph one did not allege the value of the property that defendants conspired to steal, paragraph two alleged that "it was part of the conspiracy" to transfer five million dollars of funds at the Continental Bank into accounts at other banks. Paragraph three alleged that, as "part of the conspiracy," defendants offered to pay $2,000 to an employee of the First National Bank of Chicago for the transfer of funds from the First National into accounts owned and controlled by defendants. Under the caption "OVERT ACTS," Count I detailed several meetings and conversations between defendants and other unindicted coconspirators in furtherance of the conspiracy. In addition, the superseding indictment added Balzano and Heckens as defendants on Count II and added Gironda and Heckens as defendants on Count III.

After a seven-day jury trial, the jury convicted defendants Balzano, Gironda, and Heckens on both Counts I and III and convicted defendant Speiss on Count I. With respect to Count II, the jury acquitted defendants Balzano, Gironda, and Heckens. Balzano received a sentence of forty-months' incarceration on Count I and a consecutive five-year probation period on Count III. Gironda received a sentence of three-years' incarceration on Count I and a consecutive five-year period of probation on Count III. Defendant Heckens received a four-year term of incarceration on Count I and a consecutive five-year period of probation on Count III. Defendant Speiss received a sentence of fifteen-months' incarceration on Count I.

Each defendant appeals his felony conviction on Count I on the ground that Count I failed to allege that defendants conspired to steal money and property having a value greater than $100 and that, therefore, the court should only have convicted and sentenced him for a misdemeanor under 18 U.S.C. § 371. Under this reasoning, Balzano, Gironda, and Heckens contend that they should not have been convicted for violating 18 U.S.C. § 924(c)(2) because the firearms offense did not occur

"during the commission of any felony." 18 U.S.C. § 924(c)(2). Alternatively, defendants Gironda and Heckens allege that, even if Balzano did unlawfully carry a firearm on August 19, 1982, the *Pinkerton* doctrine, which permits conspirators to be held liable for offenses committed by other conspirators in furtherance of the conspiracy, should not be applied to them. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Finally, with respect to Count III, defendant Balzano claims that insufficient evidence supported the jury's finding that he carried the gun unlawfully, as required under the statute.

Defendants Gironda, Heckens, and Speiss also challenge a number of the district court's evidentiary rulings. Defendant Gironda contends that the district court erred by admitting Ruiz' testimony that Nichols told him that Gironda called and threatened Ruiz and Velazquez. Defendant Heckens argues that the trial court should not have admitted the stolen Peat, Marwick and Mitchell check that Heckens gave Ruiz and that led to the demise of the conspiracy. Heckens also contends that the court should have granted his motion for a mistrial or a severance when, during Gironda's opening statement, Gironda advanced a defense antagonistic to Heckens' defense. Finally, defendant Speiss argues on appeal that the admission of his second confession violated his Sixth Amendment right to the effective assistance of counsel.

### III. Sufficiency of the Indictment

Defendants Balzano, Gironda, Heckens, and Speiss appeal their felony convictions on Count I, arguing that the indictment failed to charge a felony because it did not allege that defendants conspired to steal property and money having a value exceeding $100. Therefore, defendants contend, Count I states only a misdemeanor. If defendants should have been convicted only of a misdemeanor on Count I, they continue, then their convictions on Count III must be reversed. As defendants emphasize, to be guilty of the offenses charged in Count III, defendants must have unlawful-

ly carried firearms during the commission of a *felony*. 18 U.S.C. § 924(c)(2).

Count I of the indictment charged each defendant with conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. Section 371 makes it unlawful for "two or more persons to conspire ... to commit any offense against the United States" if "one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371. With respect to the penalty for violating the statute, the second paragraph of section 371 states:

> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

18 U.S.C. § 371. As alleged in Count I, the object of the conspiracy was the offense codified in 18 U.S.C. § 2113(b). According to section 2113(b), it is unlawful to "tak[e] and carr[y] away, with intent to steal or purloin, any property or money or any other thing of value ... belonging to, or in the care, custody, control, management, or possession of any bank." 18 U.S.C. § 2113(b). The severity of the sentence imposed under section 2113(b) depends upon whether the stolen property has a value greater or less than $100.

Paragraph one of Count I states that defendants conspired "to take and carry away, with intent to steal and purloin, property and money belonging to ... banks" in violation of section 2113(b). Although paragraph one assigns no value to this property, paragraph two states "[i]t was part of the conspiracy ... to cause a transfer of $5 million of the bank's funds by wire to accounts at other banks." Paragraph three states that "[i]t was further a part of the conspiracy that defendants would and did offer to pay $2,000 to the bank employee of First National Bank of Chicago to transfer a substantial amount of the bank's funds by wire to accounts at other banks owned and controlled by defendants."

Defendants never objected to the sufficiency of the indictment prior to trial. Instead, defendants waited until the first witness began testifying before objecting to the indictment. The trial judge overruled their objections, finding that Count I sufficiently stated a felony charge. Additionally, the judge noted that defendants' objections should have been made prior to trial.

■■■ In reviewing the sufficiency of an indictment, a court should consider the challenged count as a whole and should refrain from reading it in a hypertechnical manner. *United States v. Brack*, 747 F.2d 1142, 1147 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985); *United States v. Watkins*, 709 F.2d 475, 478 (7th Cir.1983). As the Ninth Circuit stated in *United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir.1976), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107, an indictment "must be read to include facts which are necessarily implied by the allegations made therein.... Even if an essential averment in an indictment is faulty in form, if it may by fair construction be found within the text, it is sufficient."

■■■ With this construction in mind, a court must interpret an indictment to determine if it fulfills three functions. First, it should state all of the elements of the offense charged; second, it should inform the defendant of the nature of the charge so that he may prepare a defense; and third, it must enable the defendant to plead the judgment as a bar to any later prosecution for the same offense. *United States v. McComb*, 744 F.2d 555, 562 (7th Cir. 1984); *United States v. Watkins*, 709 F.2d at 478. *See also United States v. Debrow*, 346 U.S. 374, 378–79, 74 S.Ct. 113, 115–16, 98 L.Ed. 92 (1953); *Hagner v. United States*, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932). In this case, defendants attack the indictment on the ground that it fails to state an essential element of the offense charged. As this court has recognized, the value of the property that defendants conspired to steal constitutes an essential element of the offense, which

must be alleged. *See United States v. Pearce*, 275 F.2d 318, 324–25 (7th Cir.1960).

■■■ Finally, before passing on the specifics of the indictment in this case, this court notes that a stricter standard of review should be used in evaluating an objection to the sufficiency of an indictment made during trial rather than before trial. In *United States v. Watkins*, this court recently stated that "an indictment not challenged before trial will be upheld 'unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted.'" 709 F.2d at 478 (quoting *United States v. Knippenberg*, 502 F.2d 1056, 1061 (7th Cir.1974)). *See also United States v. Richardson*, 687 F.2d 952, 962 (7th Cir. 1982); *United States v. Willis*, 515 F.2d 798, 799 (7th Cir.1975). Defendants argue that this rule, requiring liberal construction of an indictment not challenged before trial, should not be applied to this case. They contend that the rule applies to challenges to the validity of an indictment and not to the construction of an indictment. Even if this court were to accept this distinction, however, defendants do challenge the validity of the indictment in this case. After all, if this court accepts defendants' construction of Count I, then Counts II and III must be dismissed because they turn on the use and unlawful carrying of a firearm during the commission of a *felony*. Because the validity of Counts II and III stand or fall according to the construction of Count I, this court will review the validity of the indictment in a liberal manner.

■ Turning to the indictment in this case, this court agrees with the trial judge that, read as a whole, Count I of the indictment supports defendants' felony convictions. Although paragraph one does not include an allegation of value, paragraph two states that it was part of the conspiracy to attempt to transfer $5 million from Continental. Defendants would have this court read paragraph two in a hypertechnical way. According to defendants' interpretation, paragraph two fails to allege that the attempted transfer was illegal be-

cause the paragraph does not allege that defendants intended to transfer the funds into accounts owned or controlled by them. This court rejects defendants' construction, noting that paragraph two states that the attempted transfer was "part of the conspiracy." The unlawfulness of the conspiracy was alleged in paragraph one. Also, paragraph three does state that the conspiracy encompassed another attempted transfer in which defendants tried "to transfer a substantial amount of [First National's] funds by wire to accounts at other banks *owned and controlled by defendants*" (emphasis added).

In support of their argument that the indictment fails to charge a felony, defendants cite numerous cases that are inapposite to this case. The cases upon which defendants rely stand for the proposition that a court must read each count of an indictment independently of all other counts. *See, e.g., United States v. Gordon*, 253 F.2d 177, 180 (7th Cir.1958); *United States v. Roberts*, 465 F.2d 1373, 1375–76 (6th Cir.1972). In this case, the Government does not argue that the court should look to either Count II or Count III to cure the alleged defect in Count I. Rather, the Government argues that, correctly interpreted, Count I in and of itself alleges value. In *United States v. Kahn*, 381 F.2d 824, 829–30 (7th Cir.1967), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661, this court resorted to statements contained in the enumerated "Overt Acts" to clarify the indictment. In this case, the district court did not even go that far. Rather, the district court simply found that paragraphs two or three, read in conjunction with paragraph one, contained the necessary allegation of value. This court holds that the district court did not err in deciding that Count I alleges a felony offense. Of course, this court's holding that Count I of the indictment sufficiently supports defendants' felony convictions disposes of their related arguments that their convictions under Count III must be reversed because they did not commit a felony.

## IV. Liability under Section 924(c)(2)

### A. The *Pinkerton* Doctrine

Defendants Gironda and Heckens argue that their convictions on Count III for violating 18 U.S.C. § 924(c)(2) should be reversed because the convictions represent an unwarranted extension of the *Pinkerton* doctrine enunciated in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Section 924(c)(2) provides that whoever:

carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years.

18 U.S.C. § 924(c)(2). The evidence at trial demonstrated that on August 19, 1982, when the Postal Inspectors arrested defendants Balzano and Gironda at the zoo, defendant Balzano was carrying a pistol concealed in the waistband of his pants. On the basis of this evidence, the judge instructed the jury that it could convict defendants Gironda and Heckens of violating section 924(c)(2) if it found them guilty of conspiracy on Count I and if the government proved beyond a reasonable doubt "[f]irst, that the offense charged in ... Count III was committed; second, that the offense was committed pursuant to and in furtherance of the conspiracy; and third, that the defendant was a member of the conspiracy at the time the offense was committed." The trial judge explained that the *Pinkerton* doctrine was the basis of his instruction and that the *Pinkerton* doctrine holds "a coconspirator who commits an offense in furtherance of a conspiracy ... to be the agent of the other coconspirators." After these instructions, the jury convicted defendants Gironda and Heckens, in addition to defendant Balzano, of violating section 924(c)(2).

Defendants contend that the *Pinkerton* doctrine should not be applied to section 924(c)(2) in this case. In support of their position, defendants advance a number of essentially related arguments. Basically, defendants' first argument is that *Pinkerton* should not apply to the facts of this case because the offense to which *Pinkerton* liability would attach is not the objective of the conspiracy. In other words, according to defendants, *"Pinkerton* contemplates that where one conspirator accomplishes the illegal objective of the conspiracy, his coconspirators, although they did not personally commit the substantive crime, may also be liable for that crime."

In *Pinkerton*, two brothers conspired to violate various provisions of the Internal Revenue Code. Daniel Pinkerton was convicted of committing various substantive offenses, which were the objects of the conspiracy, although the evidence demonstrated that his brother, and not he, actually had committed these offenses. *Id.* at 645, 66 S.Ct. at 1183. In affirming Daniel Pinkerton's conviction, the Supreme Court noted that "[t]he act done was in execution of the enterprise ... [and] we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense." *Id.* at 647, 66 S.Ct. at 1184.

This court has interpreted *Pinkerton* to mean that each conspirator may be "liable for overt acts of every other conspirator done in furtherance of the conspiracy." *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir.1981). *See United States v. Covelli*, 738 F.2d 847, 858 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 211, 83 L.Ed.2d 141; *United States v. Shelton*, 669 F.2d 446, 454 (7th Cir.1982), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454; *United States v. Garza-Hernandez*, 623 F.2d 496 (7th Cir.1980). *See also United States v. Redwine*, 715 F.2d 315, 322 (7th Cir.1983) ("a proven conspirator is responsible for the substantive offenses based on the overt acts of his fellow conspirators as long as those acts were done in furtherance or as a natural consequence of the conspiracy"), *cert. denied,* — U.S. —, 104 S.Ct. 2661, 81

L.Ed.2d 367 (1984).[1] In accordance with this court's established construction of the *Pinkerton* doctrine, we held in *United States v. Galiffa*, 734 F.2d 306 (7th Cir. 1984), that the district court did not err in giving an instruction on *Pinkerton* liability similar to the one at issue in this case. *Id.* at 313, 314. In *Galiffa,* Count I charged defendant with conspiracy to distribute and to possess with intent to distribute marijuana and Count IV charged him with possession of marijuana with intent to distribute. *Id.* at 307–08. The judge instructed the jury that:

> [I]f you find that the defendant Galiffa is guilty as charged in Count I, you may also find the defendant guilty of the offense charged in Count IV, provided that you find that the essential elements of Count IV as defined in these instructions have been established beyond a reasonable doubt, and provided that you also find beyond a reasonable doubt that the possession of ... marijuana with intent to distribute was committed pursuant to the conspiracy and that the defendant was a member of the conspiracy at the time the substantive offense was committed.

*Id.* at 313. Rejecting defendant's challenge to the instruction, this court held that the foregoing instruction "comports with the *Pinkerton* doctrine." *Id.* at 314.

Defendants do not challenge their convictions on Count III on the ground that the section 924(c)(2) violation was not in furtherance of the conspiracy. Rather, defendants maintain that "[t]he *Pinkerton* rationale loses all force when the act with which the defendant is charged is not the objective of the conspiracy." Defendants' interpretation of *Pinkerton*, however, ignores numerous decisions of this court, cited above, that interpret *Pinkerton* as imposing liability, not just for the object offense, but also for acts committed in fur-

therance of the conspiracy. *See Shelton*, 669 F.2d at 454 ("each defendant is vicariously liable for the overt acts committed by the other conspirators to further the *overall scheme* ") (emphasis added). Thus, that the section 924(c)(2) violation was not the object of the conspiracy is irrelevant to defendants' liability as coconspirators. Rather, this court holds that defendants' convictions should be upheld so long as both defendants Gironda and Heckens were conspirators and so long as defendant Balzano unlawfully carried the gun in furtherance of the conspiracy.

On the basis of the evidence offered at trial, the jury properly could have found, in accordance with the court's instructions, that defendant Balzano's act of unlawfully carrying the gun was done to further the conspiracy. Only one other court to our knowledge has addressed the relationship of the *Pinkerton* doctrine to section 924(c)(2). In *United States v. Brant*, 448 F.Supp. 781 (W.D.Pa.1978), the court held a conspirator liable for his coconspirator's act of carrying a firearm during a narcotics transaction. The court reasoned that, "It cannot be denied that the possession of firearms at a narcotics transaction increases the probability of the transaction's success and, thus, is an act in furtherance of the conspiracy." *Id.* at 782.

Ruiz testified at trial that, as the wire fraud scheme began to stall, defendants became frustrated and made certain verbal and physical threats toward Ruiz and Velazquez. For example, as Velazquez testified, during his first meeting with defendants Balzano and Gironda, defendant Balzano told him that people were breathing down his back and if he was in trouble, so was Velazquez. Furthermore, Ruiz testified that, when Velazquez began to falter, Heckens told Ruiz that if Velazquez did not follow through with the plans, "there would be a lot of trouble for all of [them]."

---

1. Some courts have held, on the other hand, that *Pinkerton* liability only extends to coconspirators if "the act was done in furtherance of the conspiracy, was within the scope of the unlawful project, and could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *United States v. Sampol*, 636 F.2d 621, 676 (D.C.Cir.1980). *Accord United States v. Gleason*, 616 F.2d 2, 20 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980).

In addition, Ruiz testified that Nichols told him that he had received a phone call from defendant Gironda threatening the lives of Ruiz and Velazquez if the conspiracy did not progress.

With respect to the physical violence, Ruiz testified that, two days before defendants' arrests at the zoo, defendants Balzano and Gironda physically assaulted him in the presence of defendants Speiss and Heckens. In particular, he testified that Gironda beat him with a rubber hose and put a gun in his mouth and that Balzano put a gun to his ribs and threatened him with a straight edge razor. According to Ruiz, defendants Balzano and Gironda threatened his life for failing to follow through with the conspiracy. During this encounter, Ruiz promised to arrange a meeting with Charles Geiger, his contact at First National. As set forth earlier, defendants Balzano and Gironda apparently believed, when they arrived at the zoo two days later, that they were going to meet with Geiger to discuss the conspiracy.

Although the jury acquitted defendants Balzano, Gironda, and Heckens of violating section 924(c)(1), prohibiting the use of a firearm during the commission of a felony, in connection with the incident preceding the meeting at the zoo, the jury was entitled to find that Balzano intended to further the conspiracy by unlawfully carrying the gun to the zoo. Even discounting Ruiz' testimony that defendants Blazano and Gironda threatened him with a gun, there was abundant evidence to demonstrate that defendants were frustrated by the failure of the conspiracy to progress as planned. Accordingly, it was not unreasonable for the jury to find that defendant Balzano carried the gun to the zoo to put pressure on Geiger to follow through with the conspiracy. Thus, because the jury had sufficient evidence to prove that the section 924(c)(2) violation was in furtherance of the conspiracy and because the judge properly instructed it on that issue, this court will not disturb on appeal defendants Gironda's and Heckens' convictions on Count III.

■ Defendants raise a number of policy arguments to support their contention that *Pinkerton* should not be applied to section 924(c)(2) convictions.[2] First, defendants argue that only by "bootstrapping" can the Government convict defendants Gironda and Heckens both of conspiring to steal money and of violating section 924(c)(2). They contend that "[t]he conspiracy is an essential element of the 924(c) charge and after the conspiracy was used to satisfy the elements of 924(c), that same conspiracy was relied upon to charge other conspirators with a second crime." To convict under section 924(c)(2); however, the Government needs to prove more than the elements of the crime of conspiracy. In addition to proving that the violation occurred during the commission of a conspiracy, the Government must prove that defendant carried the gun *unlawfully*. To establish the unlawfulness of defendant's possession, the Government may resort to state or local law. *United States v. Elorduy,* 612 F.2d 986, 990 (5th Cir.1980), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2997, 64 L.Ed.2d 861; *United States v. Garcia,* 555 F.2d 708, 711 (9th Cir.1977). In this case, the Government demonstrated that defendant Balzano carried the gun concealed in the waistband of his pants. As the judge instructed the jury, under Illinois law, it is unlawful to carry a concealed weapon. This court, therefore, rejects defendants' argument that "there was no substantive crime separate and apart from the conspiracy." *See United States v. Johnson,* 658 F.2d 1176, 1181 (7th Cir.1981) ("Section 924(c)(2) ... mak[es] the carrying ... of a firearm during the commission of a felony punishable as a separate offense"); *United States v. Nigro,* 727 F.2d 100, 107 (6th Cir.1984) (en banc).

---

**2.** This court realizes that the *Pinkerton* doctrine has engendered criticism from various commentators. *See, e.g.,* W. LaFave & A. Scott, Criminal Law 514 (1972). Despite this criticism, the *Pinkerton* doctrine has been reaffirmed repeatedly in this circuit. We are not persuaded that reasons exist for overruling our prior precedents.

Defendants maintain that, even if section 924(c)(2) creates a substantive crime distinct from the conspiracy, section 924(c)(2) does not create a federal offense because the unlawfulness element is established under Illinois law. For this reason, defendants continue, "[n]o violation of federal law was alleged and, unless the Government is suggesting that *Pinkerton* creates pendent criminal jurisdiction, the illegality under state law is irrelevant." Defendants cite no cases to support their position that *Pinkerton* may not be applied to an offense *one* element of which may be established by resort to state law. Contrary to defendants' arguments, this court finds that section 924(c)(2) does create a federal offense. The federal offense under section 924(c)(2) is the act of unlawfully carrying a firearm *"during the commission of any felony for which [a defendant] may be prosecuted in a court of the United States."* 18 U.S.C. § 924(c)(2) (emphasis added). In *United States v. Howard*, 504 F.2d 1281 (8th Cir.1974), the Eighth Circuit held that a conviction under section 924(c)(2) by resort to state law is not unconstitutional. *Id.* at 1287. The court reasoned that:

> a violation of a state firearms law ... is only one element of the offense defined by 18 U.S.C. § 924(c)(2). The other element is the concurrent commission of a federal felony, which—as Congress intended—brings the offense within the jurisdiction of the federal courts.

*Id.* Because this court agrees with the Eighth Circuit that section 924(c)(2) establishes a federal offense, we reject defendants' contention that to apply *Pinkerton* to section 924(c)(2) would create pendent federal criminal jurisdiction.

Defendants also argue that the district court's application of the *Pinkerton* doctrine to section 924(c)(2) contravenes the legislative intent underlying the statute. As the Supreme Court has noted, the legislative history behind section 924(c)(2) is "sparse." *Simpson v. United States*, 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978). The record of the floor debates concerning this section indicates that Congressman Poff, the representative who proposed the statute as an amendment to the Gun Control Act of 1968, intended the statute "to persuade the man who is tempted to commit a federal felony to leave his gun at home." 114 Cong.Rec. 22231 (1968). By applying *Pinkerton* to section 924(c)(2), courts may encourage some conspirators to pressure other conspirators to leave their guns at home. As the Government argues in its brief, "If the use or unlawful possession of a firearm is an overt act done in furtherance of the conspiracy or is a natural consequence of it, then all coconspirators, as agents of each other, should be responsible for it and are in a position to preclude that act."

Second, defendants argue that to apply the *Pinkerton* doctrine to section 924(c)(2) would contravene legislative intent by subjecting defendants to multiple penalties for the same act. In support of this argument, defendants rely on the Supreme Court's decisions in *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), and *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). Those cases, however, are inapposite. In those cases, the Court examined and answered in the negative the question whether Congress intended section 924(c)(2) to apply if the predicate felony charged provided its own enhancement provision for the use of a dangerous weapon. *Simpson*, 435 U.S. at 13, 98 S.Ct. at 913; *Busic*, 446 U.S. at 404, 100 S.Ct. at 1751. Defendants attempt to liken this case to *Simpson* and *Busic* by relying on the fact that liability under section 924(c)(2) rests on proof of all of the elements of the separate offense of conspiracy. As discussed above, this court rejects defendants' position that to convict defendants Gironda and Heckens under section 924(c)(2) causes them to be *punished twice for the same offense.* Because section 924(c)(2) requires proof of an element distinct from the crime of conspiracy, this court holds that defendants' convictions under section 924(c)(2) create no double punishment problems and are

not contrary to the legislative intent underlying the statute.

## B. Defendant Balzano's Conviction

Defendant Balzano contends that this court must reverse his conviction for violating section 924(c)(2) because the evidence was insufficient to prove that he carried the gun unlawfully. On the issue of defendant Balzano's liability under section 924(c)(2), the trial judge instructed the jury that:

> the Government must prove the following propositions: first, that the defendant committed the conspiracy charged in Count I; and, second, that during the commission of that conspiracy, the defendant knowingly carried a firearm; and, third, that the carrying of the firearm was unlawful.

Concerning the question whether defendant Balzano carried the gun unlawfully, the judge instructed the jury that "[i]t is unlawful to carry a pistol, revolver or other firearm concealed on one's person."

Defendant Balzano attacks the district court's instructions on the ground that the judge did not instruct the jury to determine whether he carried the gun without authorization or a license. Under Illinois law, it is unlawful for anyone, with certain exceptions inapplicable to this case, to conceal a firearm on his or her person, Ill.Rev. Stat. ch. 38, § 24–1(a)(4) and (10), without regard to whether such person has a license. Contrary to defendant's position, therefore, the district court properly instructed the jury on Illinois law. Because the jury may rely on state law to determine the element of unlawfulness, *see, e.g.,* *United States v. Bernal,* 719 F.2d 1475, 1479 (9th Cir.1983); *United States v. Elorduy,* 612 F.2d at 990, this court rejects defendant Balzano's contention that there was insufficient evidence to support his conviction for violating section 924(c)(2).

## V. Defendant Speiss' Confession

Defendant Speiss challenges his conviction on Count I on the ground that the admission of his November confession violated his Sixth Amendment right to the effective assistance of counsel. During the trial, the district court conducted a hearing on defendant Speiss' motion to supress the inculpatory statements that he made to Postal Inspector Aiesi in August 1982 and November 1982. On the basis of the testimony given at the hearing, the district court concluded that defendant was not a credible witness and credited Inspector Aiesi's version of the events that transpired on August 19th and November 24th. In sum, Inspector Aiesi testified that on August 19, 1982, the day Speiss was arrested, Speiss confessed to him only after Inspector Aiesi had twice apprised him of his *Miranda* rights and after Speiss had signed a written waiver of his rights. With respect to the November 24th confession, Inspector Aiesi testified that defendant Speiss called him and arranged the meeting. Inspector Aiesi informed Speiss of his *Miranda* rights, and Speiss signed a written waiver. In addition, Speiss made a handwritten statement in which he stated that his attorney did not know about the meeting and that he did not want his attorney to know about it.

At trial, defendant Speiss moved to suppress both statements on the ground that they were inadmissible under Fed.R. Crim.P. 11(e)(6)(D) because they were made during the course of plea negotiations. The district court denied defendant's motion and admitted the statements in redacted form so as to avoid prejudice to the other defendants. Defendant Speiss does not challenge this ruling on appeal.

At the suppression hearing, Speiss' counsel mentioned that the admission of the November confession might present Sixth Amendment problems. To this objection, the judge responded that he would not rule on the Sixth Amendment challenge because, although Speiss' contention might form the basis of an additional motion to suppress, the motion before him failed to include any Sixth Amendment arguments. Speiss never amended his first motion or submitted a second motion dealing with his Sixth Amendment contention. In fact,

aside from his counsel's passing reference at the hearing, defendant Speiss never raised this argument during the proceedings below and, instead, raises it for the first time on appeal.

■ On numerous occasions, this court has held that a defendant waives a particular argument for reversal if he failed to raise that contention at trial. *See United States v. Nero*, 733 F.2d 1197, 1207 (7th Cir.1984); *United States v. Welsh*, 721 F.2d 1142, 1145 (7th Cir.1983). *See also United States v. Rollins*, 522 F.2d 160, 165 (2nd Cir.1975) (defendants must disclose prior to trial particular ground upon which he bases his motion to suppress evidence), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976). Unless the district court's decision to admit the November confession constituted plain error, *see* Fed. R.Crim.P. 52(b), this court must uphold the district court's ruling. According to the decisions of this court, plain error is an error that resulted in "an actual miscarriage of justice, which implies the conviction of one who but for the error would have been acquitted." *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). In addition, to enable a court to review for plain error, defendant's argument for reversal must be based on "newly-raised questions of law, untainted by factual ambiguity." *United States v. McCabe*, 720 F.2d 951, 955 (7th Cir.1983).

In this case, defendant Speiss argues that his November confession violated his Sixth Amendment right to the effective assistance of counsel and that his waivers were ineffective because he was presented with "a choice between proceeding with incompetent counsel or no counsel [which is] in essence no choice at all." *Wilks v. Israel*, 627 F.2d 32, 36 (7th Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981). Defendant argues that he was not given effective assistance of counsel because, as the Government was aware, his counsel was also representing defendant Heckens and had advised defendant Speiss "to protect Heckens at all costs."

■ We are not persuaded that the Sixth Amendment contention, which we regard as having been waived, sets forth a case of plain error requiring reversal. First, the questions whether Postal Inspector Aiesi adequately apprised Speiss of his right to the effective assistance of counsel and whether Speiss' purported waivers were valid depend on various factual determinations that this court, as a court of review, is ill-equipped to make. *See Estelle v. Smith*, 451 U.S. 454, 471 n. 16, 101 S.Ct. 1866, 1877 n. 16, 68 L.Ed.2d 359 (1981); *Robinson v. Percy*, 738 F.2d 214, 222 (7th Cir.1984). Second, even if the November confession had been suppressed, defendant would not necessarily have been acquitted. Not only did coconspirator Ruiz testify about Speiss' involvement in the wire fraud scheme, but defendant Speiss himself made a previous confession, the admissibility of which is not challenged on appeal. *See Robinson*, 738 F.2d at 220 (admissibility of first confession is harmless error because second confession was constitutionally valid).

## VI. Admissibility of the Phone Call

Defendant Gironda argues that the district court erred in permitting Ruiz to testify that Nichols told him that Nichols had received a threatening phone call from Gironda. Specifically, Ruiz testified that Gironda told Nichols that if Ruiz and Velazquez did not follow through with what they said they were going to do, they would end up dead in the trunk of a car. Defendant Gironda contends that, for three reasons, the district court should not have allowed Ruiz to testify about this phone call. First, defendant maintains, the Government did not establish a proper foundation for the admissibility of the phone call. Second, defendant claims that Ruiz' testimony constituted inadmissible double hearsay. Third, defendant argues that, because Nichols did not testify, the admissibility of the phone conversation vio-

lated his Sixth Amendment right to confront witnesses.

Because Ruiz' testimony consisted of two separate statements, this court must analyze each statement to determine whether the Government laid adequate foundation for its admissibility and whether the statement itself presents hearsay problems. In essence, Ruiz testified both to what Nichols told him and to what Gironda told Nichols. This court will analyze each statement in turn.

 With respect to Ruiz' testimony regarding Nichols' conversation with him, the Government adequately laid the foundation for its admissibility. Before testifying to the substance of Nichols' statement to him, Ruiz testified as to where and when the conversation occurred and as to who was present when it occurred. Although the portion of Ruiz' testimony dealing with Nichols' statement presents no foundational problems, it does create potential hearsay problems. Undoubtedly, the Government offered Nichols' statement to prove the truth of the matter asserted therein. More particularly, the Government offered Nichols' statement to demonstrate that Gironda had made threatening statements to Nichols. In admitting this testimony, the district court reasoned that the statement was admissible under rule 801(d)(2)(E) of the Federal Rules of Evidence as a coconspirator's statement made during the course of and in furtherance of the conspiracy.

 Prior to admitting a statement under rule 801(d)(2)(E), the court must determine that the Government has satisfied three requirements. The Government must prove, by evidence independent of the challenged statement, that a conspiracy existed. Also, it must prove that both the hearsay declarant and the defendant against whom the statement is offered are members of the conspiracy. Finally, the Government must establish that the statement was made during the course of and in furtherance of the conspiracy. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983). *See also United States v. Jefferson*, 714 F.2d 689, 696 (7th Cir.1983); *United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir.1978). In this case, the Government filed a *"Santiago* memorandum" seeking to demonstrate the satisfaction of these elements, and the district court found that the Government had met its burden of proof with respect to these prerequisites for admissibility of a statement under rule 801(d)(2)(E).

On appeal, defendant Gironda challenges only two elements of the district court's *Santiago* ruling. First, defendant argues that the Government failed to prove that Nichols was a member of the conspiracy. Second, defendant argues that there was insufficient evidence to establish that Nichols made the statement to Ruiz in furtherance of the conspiracy.

 Once the Government proves the existence of a conspiracy, the Government need only offer "slight evidence" to prove that an individual was a member of the conspiracy. *United States v. West*, 670 F.2d 675, 685 (7th Cir.1982), *cert. denied*, 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340; *United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.1979), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425. This court finds that, on the basis of the evidence offered at trial, the district court did not err in determining that Nichols was a member of the conspiracy.

 Similarly, this court finds that the district court's determination that Nichols relayed Gironda's threat to Ruiz to further the conspiracy was not clearly erroneous. *United States v. Williams*, 737 F.2d 594, 609 (7th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Defendant argues that Nichols informed Ruiz about Gironda's threatening phone call to cause him to move out of Nichols' residence. The Government, on the other hand, argues that Nichols told Ruiz about the call to inform Ruiz that the conspiracy had stalled and to pressure him into moving more quickly with the scheme. In light of the facts that defendants were becoming frustrated by the failure of the

conspiracy and that Nichols was a member of the conspiracy, this court does not find clearly erroneous the district court's determination that Nichols intended to further the conspiracy by conveying Gironda's threat to Ruiz.

The second portion of Ruiz' testimony concerned defendant Gironda's threat that, if Ruiz and Velazquez did not follow through with the conspiracy, they would end up dead in the trunk of a car. Ruiz testified that Nichols received the threatening phone call. Nichols did not testify at trial, asserting his Fifth Amendment privilege against self-incrimination. Because Nichols refused to testify, defendant Gironda argues, the Government failed to lay the proper foundation for the admissibility of Gironda's threatening statements.

▮ Rule 901 of the Federal Rules of Evidence, which governs the authentication requirement, provides that voice identification may be made "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed.R.Evid. 901(b)(5). To satisfy the requirements of rule 901, the proponent may establish the identification by direct or circumstantial evidence. *See United States v. Sawyer*, 607 F.2d 1190, 1192–93 (7th Cir.1979), *cert. denied*, 445 U.S. 943, 100 S.Ct. 1338, 63 L.Ed.2d 776 (1980); *United States v. Zweig*, 467 F.2d 1217, 1220 (7th Cir.1972), *cert. denied*, 409 U.S. 1111, 93 S.Ct. 921, 34 L.Ed.2d 692 (1973).

▮ In this case, the Government authenticated Gironda's statement by offering direct evidence to show that Nichols was familiar with Gironda's voice and could have recognized it over the phone. According to the trial testimony, Nichols had met Gironda on at least three occasions prior to the telephone call. Additionally, Ruiz testified that during at least one of these meetings Nichols engaged in extended conversation with Gironda. Ruiz' testimony that Nichols stated that he had received a phone call from "Chubby," the nickname that Ruiz and Nichols used to identify Gironda, further demonstrated that Nichols recog-

nized Gironda's voice. Since the district court's finding that Nichols was familiar with Gironda's voice was not clearly erroneous, *see United States v. Robinson*, 707 F.2d 811, 814 (4th Cir.1983); *United States v. Thomas*, 586 F.2d 123, 133 (9th Cir.1978), this court will not disturb the district court's conclusion that the Government laid a proper foundation for Gironda's statement. *See United States v. Vitale*, 549 F.2d 71, 73 (8th Cir.1977) (rule 901(b)(5) satisfied through evidence that proponent had spoken with defendant on three occasions *subsequent* to phone call); *cert. denied*, 431 U.S. 907, 97 S.Ct. 1704, 52 L.Ed.2d 393.

▮ Ruiz' testimony concerning the substance of Gironda's threats toward Nichols presents no hearsay problems. Clearly, the Government did not offer Gironda's statement to prove that Ruiz and Velazquez would in fact end up dead if they did not cooperate. Rather, the Government intended to show that threats were a part of the conspiracy and that Gironda was involved in the conspiracy. *See United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir.1978); *United States v. Pate*, 543 F.2d 1148, 1149 (5th Cir.1976).

▮ Defendant Gironda's final objection to the admissibility of Ruiz' testimony concerning the phone call is that the Government violated his Sixth Amendment right to confront witnesses by failing to put Nichols on the stand. Although the standards for evaluating a confrontation clause challenge to testimony admitted under rule 801(c)(2)(E) vary from circuit to circuit, this court has stated in numerous cases that the admissibility of a statement under rule 801(d)(2)(E) does not offend the confrontation clause. *United States v. Chiavola*, 744 F.2d 1271, 1276 (7th Cir. 1984); *United States v. Xheka*, 704 F.2d 974, 987 (7th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682; *United States v. Papia*, 560 F.2d 827, 836 (7th Cir.1977). Accordingly, we hold that the district court did not err in deciding that the confrontation clause did not bar

the admissibility of statements under rule 801(d)(2)(E).

## VII. Admission of the Check

Defendant Heckens assigns as error the district court's decision to admit the stolen Peat, Marwick and Mitchell check that Ruiz claimed Heckens gave him as payment for some renovation work and that led to the discovery of the conspiracy. When the Government began to elicit testimony concerning this check, defendant Gironda's counsel objected, and the judge then instructed the jury that they should only consider Ruiz' testimony as evidence against defendant Heckens and not as evidence against any of the other defendants. When the Government offered the check into evidence, defendants Balzano, Gironda, and Speiss again objected. On the other hand, defendant Heckens stated, when asked by the court, that he had no objection to the admission of the check. The court then admitted the check into evidence only against defendant Heckens. Even though he made no objection at trial, defendant Heckens now claims that the court erred in admitting the check because the admission violated rule 404(b) of the Federal Rules of Evidence, which limits the admissibility of evidence of other crimes.

Defendant's failure at trial to object to the admission of evidence operates as a waiver of that objection unless the admission constituted plain error. *United States v. Hickerson*, 732 F.2d 611, 613 (7th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 159, 83 L.Ed.2d 95; *United States v. Weed*, 689 F.2d 752, 756 (7th Cir.1982). As discussed previously, the standard to prove plain error is a difficult one to meet. To find plain error, this court must determine that the district court's error was a "serious and harmful error of constitutional magnitude." *United States v. Jefferson*, 714 F.2d 689, 693 (7th Cir. 1983). A reviewing court should exercise its discretion to find plain error "cautiously and only in exceptional circumstances." *United States v. Jackson*, 542 F.2d 403, 409 (7th Cir.1976). *Accord United States*

*v. Verkuilen*, 690 F.2d 648, 658 (7th Cir. 1982).

Even assuming that the district court should have excluded the check, its error in admitting the evidence would not amount to plain error. Upon review of the record in this case, this court finds that, considering all of the testimonial and documentary evidence establishing defendant Heckens' role in the conspiracy, any prejudice that Heckens suffered due to the admission of the check was inconsequential. Further, this court is reluctant to exercise its discretion to find plain error when defendant's failure to object at trial constituted a tactical decision. In *United States v. Allain*, 671 F.2d 248 (7th Cir.1982), this court refused to apply the plain error doctrine to the district court's decision to permit testimony concerning other criminal acts. *Id.* at 252. In that case, this court noted that defendant decided not to object, when asked by the court, because he wanted to use the evidence to impugn the credibility of the prosecution's witnesses, who were also involved in these crimes. Similarly, in this case, defendant Heckens presumably decided not to object to the admission of the check because he wanted to use that evidence to attack Ruiz' credibility. In essence, defendant Heckens argued that, because the Government never charged him in connection with the stolen check, the Government must not have believed Ruiz, and, therefore, the jury should not have considered him a credible witness. Under these circumstances, we refuse to assign plain error to the district court's decision.

## VIII. Defendant Heckens' Motion for Severance

At trial, defendant Heckens moved for a mistrial or, alternatively, for a severance of his trial from the trial of his codefendants. Specifically, Heckens objected to a portion of defendant Gironda's opening statement in which he stated:

Mr. Gironda is here because he was in the wrong place at the wrong time.... He had nothing to do whatsoever with the [conspiracy]. That is why he is here.

There is the problem when you have a conspiracy. You have what is called guilt by association, but that is not the law. We ask you not to convict someone where there is guilt by association. He is not guilty. He never conspired.

On the following day, defendant Heckens moved for a mistrial or a severance on the ground that Gironda's opening statement, to exonerate himself, implied that Heckens was guilty. The district judge rejected defendant Heckens' contention that he and defendant Gironda were presenting inconsistent defenses and denied Heckens' motion.

■ Defendant Heckens concedes that a reviewing court rarely will reverse a lower court's denial of a motion for severance. *United States v. Moschiano*, 695 F.2d 236, 245–46 (7th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983). In *United States v. Echeles*, 352 F.2d 892 (7th Cir.1965), this court explained the preference for joint trials in conspiracy cases: "[T]he general rule has evolved that persons jointly indicted should be tried together, ... particularly so where the indictment charges a conspiracy or a crime which may be proved against all the defendants by the same evidence and which results from the same or similar series of acts." *Id.* at 896. *Accord United States v. Papia*, 560 F.2d 827, 836 (7th Cir.1977). The district court is in the best position to balance this preference against the concern that a joint trial may be confusing to the jury and result in prejudice to one or all of the defendants. *United States v. Shively*, 715 F.2d 260, 267 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). For this reason, the decision whether to grant a motion for severance is committed to the sound discretion of the trial court and will not be overturned on appeal unless the trial court clearly abused its discretion. *United States v. Oxford*, 735 F.2d 276, 279 (7th Cir.1984).

■ Severance should be granted only if defenses are so "mutually antagonistic" that the acceptance of one defendant's defense will preclude the acquittal of the other defendant. *United States v. Hendrix*, 752 F.2d 1226, 1232 (7th Cir. 1985); *United States v. Ziperstein*, 601 F.2d 281, 285 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). In this case, defendant Gironda argued in his defense that he was innocent of any conspiracy that might have occurred. Defendant Heckens argued in his defense that the Government failed to prove its case against him. In *United States v. Petullo*, 709 F.2d 1178 (7th Cir. 1983), this court rejected the contention that a defense based on non-participation is mutually antagonistic to a defense based on the Government's failure to prove its case. *Id.* at 1181–82. Similarly, the jury here could have accepted both Gironda's defense that he did not participate in the scheme and Heckens' defense that the Government failed to prove all of the elements of the crime of conspiracy. Therefore, even if this court were to agree with defendant Heckens that defendant Gironda's opening statement implied both the existence of a conspiracy and Heckens' involvement in it, this court still finds that the district court did not abuse its discretion in denying Heckens' motion for a severance or a mistrial.

## IX. Conclusion

For the foregoing reasons, the convictions of defendants Balzano, Gironda, Heckens, and Speiss on Count I and the convictions of defendants Balzano, Gironda, and Heckens on Count III are AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I think that the majority argues as persuasively as circumstances permit for the application of the *Pinkerton* rule here. Perhaps these conspirators could have foreseen one of their number carrying a gun under his belt. But the potential for abuse of this sort of application seems immense. For example, what are the limits, if any, upon vicarious liability for antitrust conspirators for all manner of secret acts arguably in furtherance of the conspiracy?

At some point it would seem appropriate to set limits.