UNITED STATES of America, Plaintiff–Appellee,

v.

Juan Carlos OCAMPO and Luis Alfonso Escobar, Defendants–Appellants.

Nos. 88–1788, 88–1816.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 7, 1989.

Decided Nov. 15, 1989.

As Amended Nov. 28, 1989.

Anton R. Valukas, U.S. Atty., David J. Stetler, Howard M. Pearl, Victoria J. Peters, and Rocco J. DeGrasse, Asst. U.S. Attys., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

Robert F. Nemzin, Office of the Corporation Counsel, Law Dept., Antonio J. Curiel, Curiel & Jones, Chicago, Ill., for Juan C. Ocampo.

James W. Reilley, Reilley & Associates, Des Plaines, Ill., for Luis A. Escobar.

Before FLAUM, RIPPLE, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Defendants Juan Carlos Ocampo and Luis Alfonso Escobar were each convicted by a federal jury of conspiring to possess with intent to distribute approximately ten kilograms of cocaine (Count I), possessing with intent to distribute approximately ten kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts II and III), and the use and possession of a firearm during and in relation to the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (Count IV). Each defendant received a five-year term of imprisonment on Counts I and III, a ten year term of imprisonment on Count II, and a five year term of imprisonment on Count IV. The sentences on Counts I, II, and III run concurrently with each other but consecutive to the sentence imposed on Count IV. Each defendant also received a term of supervised release of six years. On appeal, Escobar and Ocampo challenge their convictions claiming that: (1) the actions of a police officer who approached their vehicle with his gun drawn to "interview" them constituted a full-blown arrest which was not supported by probable cause, and consequently, all evidence thereafter seized should have been suppressed; (2) even if the actions of the officers did not constitute an arrest, the officers did not have a reasonable suspicion to support an investigatory stop; (3) the government failed to prove beyond a reasonable doubt that defendants used and carried a firearm during and in relation to a drug trafficking crime; and (4) the trial court improperly sentenced them to an enhanced penalty for their convictions on Count II. We find no merit in any of the defendants' contentions and, therefore, affirm the convictions.

## I. FACTS

On July 18, 1987, Lieutenant Maurice Dailey of the Chicago Police Department received a tip from a paid confidential informant that Luis Alfonso Escobar, a pilot, was expecting a large cocaine shipment and might attempt to fly or drive that shipment into Chicago. The informant told Dailey that Escobar used several locations to store his cocaine, but that he knew of only one such location, 4056 North California Avenue in Chicago. The informant described Escobar as a male Columbian in his late 20's or early 30's with black hair and a large build. At trial, Officer Dailey described the informant as reliable and as one who had never given him wrong or misleading information in the past. On cross examination, Dailey testified that the informant did not receive the information directly from Escobar.

On the basis of this information, Dailey and a team of fellow officers immediately began a surveillance of the three story apartment complex located at 4056 North California. The officers continued their surveillance for a period of three days until, on July 20, at about 1:40 p.m., they observed a silver Datsun 280 ZX pull into a carport area at the rear of the apartment complex. A registration check on the vehicle's license plates revealed that the automobile was not a rental and that it was registered to a female with a last name different from Escobar. Dailey testified at trial that as a police officer with fifteen years of experience in narcotics investigations, it was his opinion that narcotics traffickers often use automobiles with fictitious license plates or vehicles belonging to someone else. He also testified that the Datsun 280 ZX is the type of automobile that drug dealers prefer to use during narcotics transactions.

The officers observed as two males exited the Datsun. Both men met the general description of Escobar provided by the informant. The driver was later identified as Luis Alfonso Escobar and the passenger as Juan Carlos Ocampo. Escobar was observed carrying a white plastic bag. The officers could not see the contents of the bag but Officer Dailey testified that narcotics dealers often use plastic bags of this sort to transport money or narcotics.

Escobar carried the white bag up a stairway to the third floor. Ocampo did not immediately follow Escobar up the stairwell but instead stopped and scanned back and forth down an alley adjacent to the parking lot. He also looked westward down the street bordering the apartment complex. Dailey testified, and the trial judge found at the suppression hearing, that based on his experience as a law enforcement officer, Ocampo was conducting "countersurveillance."

After a brief interval, Ocampo followed Escobar up the stairwell to the third floor where Escobar opened Apartment 3–D with a key. Both men then entered the apartment. They remained in the apartment for approximately fifteen to twenty minutes and then exited together. Ocampo walked down the stairwell first to the parking lot and again engaged in counter-surveillance while Escobar remained in the stairwell. Escobar stayed in that location until Ocampo looked up in his direction, at which point he walked down the stairs and met Ocampo in the parking lot. Escobar was still carrying a white plastic bag. They then entered the Datsun with Escobar driving.

At this point, Officer Dailey decided to "interview" Escobar and Ocampo and he transmitted his intentions by radio to the other officers. Dailey and one or two other officers then approached the vehicle. As he approached, Dailey drew his gun for protection and as he came within 20 feet of the automobile he observed Ocampo bent over inside the vehicle placing an object on the floor of the passenger side. The officers were unable to identify the object as they approached but they did observe Ocampo attempting to kick it underneath the passenger seat. Officer Dailey removed Ocampo from the vehicle and Dailey recovered the object, a loaded blue steel revolver, from underneath the passenger seat. Ocampo and Escobar were then placed under arrest for the unlawful use of

a weapon in violation of state law[1] and were immediately transported to the DEA offices in Chicago. The officers secured the Datsun and sealed the door to Apartment 3–D after performing an initial search in order to preserve evidence.

A narcotics detecting dog was then brought to the scene. Dailey testified that he had used that dog on at least six or seven previous occasions. The dog had never falsely alerted to the presence of narcotics. The dog gave a positive alert for narcotics at both the passenger and driver doors of the Datsun. Likewise, the dog gave a positive alert for the presence of narcotics at the front door to Apartment 3–D. The officers then sought and received separate search warrants for the automobile and the apartment. They executed the warrants and found 5,000 grams of cocaine in Apartment 3–D and 4,998 grams of cocaine in the Datsun. The cocaine in the vehicle was found in the white plastic bag which Escobar was observed carrying into and out of the apartment premises.

Ocampo and Escobar were indicted by the July 1989 Grand Jury in a single four count indictment. Count I of the indictment charged each with conspiring to possess with intent to distribute approximately ten kilograms of cocaine. Counts II and III charged each defendant with possessing with intent to distribute a mixture containing cocaine in the amounts of 5,000 net grams (Count II) and 4,998 net grams (Count III) in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count IV charged that each defendant used and carried a firearm during and relation to the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).

The defendants filed a motion to suppress, *inter alia,* the revolver and the nearly 10,000 grams of cocaine seized pursuant to the search warrants. At the suppression hearing, the court found that probable cause existed to support the arrest of the defendants and the search warrants for both the apartment and the Datsun. The court based its findings on the factual determinations that: (1) the confidential informant used by Dailey was reliable; (2) the location given by the informant was the location at which both defendants were observed; (3) both defendants fit the informant's general physical description of Escobar; (4) counter-surveillance techniques were used by Ocampo when entering and exiting the apartment complex; (5) a revolver was present in the automobile at the time the defendants were arrested; and (6) a certified narcotics detecting dog alerted positive for the presence of narcotics at both the apartment door and the doors of the automobile prior to the issuance of the search warrant. The court also found that Lieutenant Dailey did not see the revolver in the Datsun at the time he was approaching that vehicle.

## II.

We begin by addressing the defendants' contention that Officer Dailey effectuated a full-blown arrest without probable cause when he approached the Datsun with his gun drawn and pointed at Ocampo. The defendants argue in the alternative that even if such actions did not constitute an arrest, the officers lacked a reasonable suspicion to support an investigatory stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Therefore, they argue, the resulting searches of the automobile and the apartment were tainted by the initial illegality and the fruits of the searches, namely the almost 10,000 grams of cocaine and the loaded blue steel revolver, should be suppressed. We need not evaluate whether the police had probable cause to arrest the defendants as they approached the automobile because we find that the officers' actions did not constitute an arrest but instead arose only to the level of a valid *Terry* stop based upon reasonable suspicion.

### A.

The fourth amendment protects the right of the people to be secure in their persons, houses, papers, and effects

---

**1.** Presumably, the defendants were arrested for violation of Chapter 38, Ill.Rev.Stat., § 24–1(4).

against unreasonable searches and seizures. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that consistent with the fourth amendment, a police officer who observes suspicious activity may, though he lacks the probable cause traditionally necessary to make an arrest, stop an individual briefly to investigate the circumstances provoking the suspicion, provided that the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. A *Terry* investigatory stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity. To determine whether an officer's suspicion of criminal activity was reasonable, a court must evaluate the totality of the circumstances as they appeared to the officer at the time of the stop. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

■ The defendants rely primarily upon the alleged unreliability of Officer Dailey's confidential informant to support their assertion that the police lacked reasonable suspicion for an investigatory stop. They argue that because the informant did not receive his information directly from Escobar or Ocampo but instead from an unrevealed secondary source, the officer's reliance on the tip was unreasonable. We need not address whether the police would have had a reasonable suspicion had they acted solely on the basis of the uncorroborated tip of a previously reliable informant because such is not the case here. The information supplied by the informant was just one factor among many supporting a reasonable and articulable suspicion that the defendants were engaged in criminal activity. The factors supporting such a finding include:

(1) Officer Dailey met personally with a reliable confidential informant whom Dailey had known for two and one-half years and had never supplied him with false information in the past. The informant had previously supplied information in the past eight months leading to the seizure of large amounts of cocaine on four occasions;

(2) the informant told him that Escobar was a pilot and was bringing a large shipment of cocaine to a Chicago address. The informant also provided a description of Escobar;

(3) the surveillance at 4056 N. California on July 20, 1987, resulted in the officers observing the arrival of two men meeting the general description provided by the informant;

(4) the two men were driving a Datsun 280 ZX, an automobile favored by drug traffickers. The police knew that the automobile was not registered to either of the defendants;

(5) the officers observed Ocampo conducting counter-surveillance techniques prior to entering the apartment and again after exiting the apartment; and

(6) Escobar was observed carrying a plastic bag of the type often used by drug traffickers.

Taken together, these six factors created a reasonable and articulable suspicion to support an investigatory stop. Therefore, we hold that under these circumstances the police had "a particularized and objective basis to make an investigatory stop." *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695.

### B.

■ We now turn to the second part of our inquiry: whether the officer's actions were reasonably related in scope to the circumstances surrounding the *Terry* stop. Specifically, we address the defendants' assertion that Officer Dailey's use of his gun was unreasonable and served to transform the investigatory encounter into a full-blown arrest which was not supported by probable cause.

The issue of when an investigatory stop turns into an arrest has been the subject of much judicial debate. Courts have been unable to develop a bright-line test to determine when, given the "endless variations in facts and circumstances," police-citizen encounters exceed the bounds of mere

investigative stops. *Florida v. Royer,* 460 U.S. 491, 506–07, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983). In general, officers may take such steps as are "reasonably necessary to protect their personal safety and to maintain the status quo" so that the limited purposes of the stop may be achieved. *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). As indicated by the language in *Terry,* the question of whether a seizure is an investigatory stop or an arrest involves the determination of whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the circumstances at hand. *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1878–79. In reviewing the officers' actions, we take note of the admonition that the "circumstances before [the officer] are not to be dissected and viewed singly; rather, they must be considered as a whole." *United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir.1976).

This court has previously rejected the defendants' proposition that a *Terry* stop becomes an arrest merely because an officer pointed a gun at the suspect. *United States v. Serna–Barreto,* 842 F.2d 965, 967 (7th Cir.1988); *United States v. Novak,* 870 F.2d 1345 (7th Cir.1989). Other courts reviewing similar facts have agreed that an officer can point a gun at a suspect without transforming an investigatory stop into an arrest. *United States v. Manbeck,* 744 F.2d 360, 377 (4th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *United States v. Merritt,* 695 F.2d 1263, 1272–74 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983); *United States v. Harley,* 682 F.2d 398, 400–02 (2d Cir.1982); *United States v. White,* 648 F.2d 29 (D.C. Cir.), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981); *United States v. Aldridge,* 719 F.2d 368 (11th Cir. 1983); *United States v. Pantoja–Soto,* 768 F.2d 1235 (11th Cir.1985); *United States v. Trullo,* 809 F.2d 108 (1st Cir.1987), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1988); *United States v. Hardnett,* 804 F.2d 353 (6th Cir.1986), *cert. denied,* 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987); *United States v. Ei-*senberg, 807 F.2d 1446 (8th Cir.1986); *United States v. Jones,* 759 F.2d 633 (8th Cir.1985), *cert. denied,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1986).

With no per se rule against the use of a weapon during an investigatory stop, we must determine whether the officer's actions were reasonably related in scope to the circumstances at hand. In *Terry* the Supreme Court recognized that in assessing the reasonableness of a police detention, "we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." 392 U.S. at 20, 88 S.Ct. at 1881. The officer must be allowed "to pursue his investigation without fear of violence." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day and the reaction of the suspect to the approach of the police are all facts which bear on the issue of reasonableness. *United States v. Serna–Barreto,* 842 F.2d at 967; *United States v. Harley,* 682 F.2d 398 (2d Cir.1982); *United States v. Bull,* 565 F.2d 869, 870 (4th Cir.1977), *cert. denied,* 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978).

We recognize that Officer Dailey's show of force was highly intrusive and under some circumstances would certainly be tantamount to an arrest. Here, however, the officer, a fifteen year drug enforcement veteran, suspected that the defendants were drug traffickers carrying a large shipment of drugs. The suspects were seated in a car and the officer did not have them in full view. It is beyond dispute that drug traffickers are often armed and dangerous and that "they sometimes shoot policemen." *Serna–Barreto,* 842 F.2d at 967. The officer observed Ocampo fumbling under the passenger seat with an unseen object as he approached. Reviewing the situation through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training, we cannot say that he acted unreasonably in being

**1370**

prepared for possible violence. Officer Dailey reasonably believed that safety precautions were necessary to protect himself and his fellow officers, and therefore, the limited use of his weapon was a reasonable precaution in the context of an investigatory stop. The fact that Officer Dailey *may* have effectuated the stop without the use of his gun does not make the stop unreasonable. As the Supreme Court recognized in *Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973), "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable."

In sum, after analyzing all the circumstances surrounding the seizure of the defendants, we do not find the officer's conduct so intrusive and unreasonable as to constitute an arrest; the officer's actions were reasonably related in scope to the circumstances at hand. *Terry*, 392 U.S. at 19–20, 88 S.Ct. at 1878–79. Accordingly, the trial judge properly denied the defendants' motion to suppress the revolver and the nearly 10,000 grams of cocaine.[2]

### III.

We now turn to the defendants' claims challenging the sufficiency of the evidence. Our standard of review is well established.

We must examine the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences, and can reverse only if we find that a reasonable fact-finder could not have found the essential elements of the offense beyond a reasonable doubt. *United States v. Colonia*, 870 F.2d 1319 (7th Cir.1989); *United States v. Rollins*, 862 F.2d 1282, 1287 (7th Cir.1988). We can "reverse a jury's verdict of conviction only if the defendant can establish that 'the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Goudy*, 792 F.2d 664, 674 (7th Cir.1986)).

### A.

Defendants assert that the government failed to prove beyond a reasonable doubt that they "used or carried" a firearm during and "in relation to" a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). That statute provides, in relevant part, "[w]hoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years."[3] The defendants submit that

---

**2.** We note that a different result is not mandated by this court's recent holding in *United States v. Novak and Leon*, 870 F.2d 1345 (1989), a case not cited by either party. *Novak and Leon* is clearly distinguishable on its facts. In that case, the stop was by a group of six to nine law enforcement officers in a lighted public place (an airport). Not being in a car, the suspects actions were fully visible and they were in the process of cooperating with the officers. Even though the two defendants were not believed to be armed or dangerous, one officer drew her gun and pointed it directly at one suspect's head at close range. The other then had his identification and duffle bag taken and was closely escorted some distance away to the sheriff's office. The court found that in such a situation there was no justification for pointing a gun at the defendants, and that the *Terry* investigatory stop quickly turned into a full-fledged warrantless arrest without probable cause. The court chided the officers for their blundering behavior finding that the use of the gun was wholly unwarranted and concluded that "'this is not a venture of which law enforcement might be

proud.'" *Id.* at 1347. In contrast, in the instant case, the officers had justifiable concerns for their safety and Officer Dailey acted reasonably in using his gun.

**3.** 18 U.S.C. § 924(c)(1) states in full:

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or devise) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a machinegun, or is equipped with a firearm silencer or muffler, to imprisonment for thirty years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, and if the firearm is a machinegun, or is equipped with a firearm silencer or firearm

the facts of this case—where the gun was never displayed or brandished and was not found in the actual possession of either defendant—do not satisfy the "use or carry" or the "in relation to" requirements of the statute. We disagree.

■ This court has previously held that the fact the defendant "never had the chance to brandish or discharge his gun does not mean that he did not 'use' it" within the meaning of § 921(c)(1). *United States v. Rosado*, 866 F.2d 967, 969 (7th Cir.1989) (quoting *United States v. Moore*, 580 F.2d 360, 362 (9th Cir.1978), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978)). While Ocampo never displayed or fired the weapon during the encounter, there was ample evidence for the jury to find that he had the gun in his possession and was in the process of hiding it under the seat as the police approached the automobile. Under these circumstances it was reasonable for the jury to conclude he "carried" the weapon as required by the statute.

■ There was also ample evidence to support a finding that Ocampo "used" the weapon during the commission of the felony. "Using" a weapon under § 924(c)(1) includes the possession of a firearm which in any manner facilitates the execution of a felony. *United States v. LaGuardia*, 774 F.2d 317, 321 (8th Cir.1985). Given the value of the cocaine and the known risks of conducting an illegal drug business, the jury could reasonably infer from all of the evidence that Ocampo possessed a loaded revolver in order to protect himself, his partner, and his cocaine shipment. *See United States v. Diaz*, 864 F.2d 544, 549 (7th Cir.1988). Furthermore, the jury surely was entitled to find that the presence of a loaded revolver so close at hand provided Ocampo with the security and confidence necessary to undertake such a large drug transaction. *Rosado*, 866 F.2d at 970. The

weapon, by "providing the defendant with security and confidence, facilitated the narcotics transaction." *Diaz*, 864 F.2d at 549. As then-judge, now Justice Kennedy noted in *United States v. Stewart:*

> If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or to intimidate others, whether or not such a display or discharge in fact occurred, then there is a violation of the statute.

779 F.2d 538, 540 (9th Cir.1985), *cert. denied*, 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987).

■ The defendants further contend that because the gun was recovered from underneath the passenger seat and was not displayed in any manner during the encounter, it did nothing to "facilitate" the cocaine possession or conspiracy and thus was not used "in relation to" a drug trafficking crime. The "in relation to" language was added to § 924(c)(1) when Congress revised the statute in 1984 and the defendants argue that Congress added the language to require a stronger link between the firearm and the underlying crime. We believe that the defendants' interpretation of the statute is incorrect. As noted by then Judge Kennedy "the 'in relation to' language was not intended to create an element of the crime which did not previously exist [when the language was simply during], but rather was intended to make clear a condition already implicit in the statute," *id.* at 539, namely, that a person could not be prosecuted for inadvertently carrying a firearm in an obviously unrelated crime. *Ramos*, 861 F.2d at 231. The evidence on the record in this case places Ocampo's conduct

muffler, to imprisonment for life imprisonment without release. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run con-

currently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried. No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed herein.

clearly within the parameters of § 924(c)(1) as the government produced sufficient evidence at trial to link the gun to the narcotics offenses and to prove that the weapon was not inadvertently carried in relation to an obviously unrelated crime.

 Finally, as our recent decisions in *United States v. Diaz*, 864 F.2d 544 (7th Cir.1988) and *United States v. Rosado*, 866 F.2d 967 (7th Cir.1989), firmly establish, Escobar is also liable under the statute because he participated with Ocampo in the conspiracy to possess cocaine with intent to distribute under circumstances where one could reasonably expect that a weapon would be carried. *See United States v. Gironda*, 758 F.2d 1201 (7th Cir.1984), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985) (extending *Pinkerton* doctrine to § 924(c)).

### B.

 The defendants next contend that the government failed to prove beyond a reasonable doubt that the cocaine seized from the apartment weighed 5,000 grams, and thus the trial court wrongly imposed enhanced sentences pursuant to 21 U.S.C. § 841(b). § 841(b) provides in relevant part:

In the case of a violation of subsection (a) of this section involving ... (ii) 5 kilograms or more of a mixture containing a detectable amount of ... (III) cocaine ... such person shall be sentenced to a term which may not be less than 10 years or more than life.

Ocampo and Escobar argue that § 841(b) is a separate substantive offense and that the amount of cocaine is an essential element of § 841(b). Therefore, the issue of the quantity of the cocaine must be submitted to the jury and be proven beyond a reasonable doubt. They conclude that the trial judge erred in refusing to submit a special verdict tendered by the defendants to the jury to determine the exact amount of the cocaine involved and committed further error by finding on his own at the sentencing hearing that the cocaine weighed over 5,000 grams. We disagree.

In *United States v. Acevedo*, 891 F.2d 607, 611 (7th Cir.1989), decided after the briefs were filed in this case, we held that § 841(b) is an enhanced penalty provision rather than a separate substantive offense. *See also United States v. Gibbs*, 813 F.2d 596 (3d Cir.), *cert. denied*, 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987); *United States v. Morgan*, 835 F.2d 79, 81 (5th Cir.1987); *United States v. McHugh*, 769 F.2d 860, 868 (1st Cir.1985); *United States v. Simmons*, 725 F.2d 641 (11th Cir.1983), *cert. denied*, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984). As an enhanced penalty provision, its elements need not be charged to the jury but instead are to be considered by the court at sentencing. *Acevedo*, slip op. at 6. Once the proof at trial establishes a particular quantity of a controlled substance, that amount triggers the application of § 841(b)'s sentencing provisions. Thus, the trial court acted properly in reserving for itself the determination as to the amount of cocaine forming the basis for defendants' convictions on Count II and in rejecting the defendants' special verdict.

 The trial court's finding at sentencing that each defendant possessed with intent to distribute 5,000 grams of cocaine is a factual one and thus our standard of review is one of clear error. *United States v. Agyemang*, 876 F.2d 1264 (7th Cir.1989). A careful examination of the record reveals that the government produced sufficient evidence to support the court's finding. The chemist who weighed the cocaine, a senior training officer in the DEA laboratory, testified that the container in which the drug arrived at the laboratory was sealed from the time it arrived until the time he weighed the cocaine itself. The cocaine arrived in the laboratory the day after the defendants were arrested wrapped in two layers in an elaborate fashion. The court could reasonably infer that the tightly wrapped packages prevented the cocaine from picking up or losing any appreciable amount of water which would affect its weight. Officer Dailey testified to field testing a sample of the cocaine found in the apartment prior to sending it to the laboratory. Thus, some additional cocaine existed before it was weighed by the chemist. These facts and the inferences derived therefrom support the trial

court's application of § 841(b)'s enhanced penalty. The trial court's decision is not clearly erroneous and, accordingly, we affirm.

### IV.

 Finally, the defendants contest the sufficiency of the indictment to support the imposition of the enhanced penalty under § 841(b). Count II of the indictment states:

> On or about July 20, 1987, at Chicago, in the Northern District of Illinois, Eastern Division, Luis Alfonso Escobar and Juan Carlos Ocampo, defendants herein, knowingly and intentionally did possess with intent to distribute approximately 5000 net grams of a mixture containing cocaine, a schedule II Narcotic Drug Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

The defendants claim that the use of the phrase "approximately 5,000 grams" in Count II was so vague as to violate the due process clause by failing to provide sufficient notice to support the imposition of an enhanced penalty provision under § 841(b). Our standard of review concerning the adequacy of the indictment to support the enhanced penalty is plenary as it involves a matter of law. *United States v. Gironda,* 758 F.2d 1201, 1209 (7th Cir.1985).

 The due process clause requires that an indictment provide a defendant with notice of the charge against them and a description of the offense so as to prevent further prosecution for the same offense. *See Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). Rule 7 of the Federal Rules of Criminal Procedure requires that an indictment be a "plain, concise and definite written statement with the essential facts constituting the offense charged." Fed.R. Crim.P. 7(c)(1). To satisfy Rule 7 and constitutional requirements an indictment must state all the elements of the offense charged, inform the defendant of the nature of the charge so that he may prepare a defense, and enable the defendant to plead the judgment as a bar to any later prosecution for the same offense. *See Gironda,* 758 F.2d at 1209; *United States v.*

*Smalley,* 754 F.2d 944 (11th Cir.1985). The indictment need not cite to an enhanced penalty provision, but instead must only make a defendant aware of the possibility that enhanced penalty provisions could apply. *Gibbs,* 813 F.2d at 601. We find that the indictment was sufficient to meet these requirements. In reviewing the sufficiency of an indictment, we must "consider the challenged count as a whole and should refrain from reading it in a hypertechnical manner." *Gironda,* 758 F.2d at 1209. The language of the indictment here tracks the language of the statutes in sufficient detail to leave no question of the nature of the charges. The use of the term "approximately" does not serve to defeat such notice because when the four corners of the indictment are read in their entirety, it is obvious that the penalty provision of 841(b) could apply to these defendants. Indeed, defendants undermine their claim of lack of notice by admitting in their brief that they vigorously and continuously challenged the exact quantity of cocaine seized from the car. Their concern with the 5000 gram amount reveals that they were aware of the enhanced penalties associated with Count II. Accordingly, we find that the indictment fairly appraised the defendants that they were subject to the enhanced penalty provisions of § 841(b) if convicted on Count II of the indictment.