909 F.2d 1486
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff/Appellee,
v.
Glenn GRIDLEY, Defendant/Appellant.
 No. 90-1156.
 United States Court of Appeals, Seventh Circuit.
 Argued June 19, 1990.
Decided Aug. 1, 1990.
Rehearing and Rehearing In Banc Denied Oct. 30, 1990.
 
 Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 
 ORDER
 
 1
 In this direct criminal appeal, Glenn Gridley challenges his conviction and sentence on the following two grounds: (1) that the government failed to adduce evidence sufficient to support a conviction for using a firearm in relation to drug trafficking under 18 U.S.C. Sec. 924(c)(1); and (2) that his five-year sentence under section 924(c) violates his right to due process.
 
 I.
 
 2
 Gridley was arrested on May 13, 1989, in his home. Upon executing a search warrant, the police found Gridley laying on his bed in his bedroom. Next to the bed on the nightstand, police found a .45 caliber handgun in an unzipped pouch with the edge of the gun handle visible; the gun was loaded with alternating rounds of glaser[1] and hollow point bullets,[2] and a glaser round was in the chamber. Police found eight ounces of cocaine in a bag in the bedroom. They also uncovered drug paraphernalia, including cutting agents, cocaine inhalers, a digital scale, and records related to drug trafficking.
 
 
 3
 Gridley pleaded guilty to conspiracy to distribute cocaine and possession with intent to distribute cocaine, but opted for a bench trial on the remaining charge: using a gun in relation to a drug trafficking crime in violation of 18 U.S.C. Sec. 924(c)(1).[3] Evidence adduced at trial showed that Gridley was a long-time gun enthusiast who often kept a loaded gun nearby, especially when he slept. Gridley was a member of the National Rifle Association and believes that it is his constitutional right to possess guns for both protection and sport. Gridley received his first gun as a teenager and had acquired a number of others since then. He complied with all state gun regulations, and acquired the necessary permits and licenses for his firearms.
 
 
 4
 Once Gridley began selling drugs, he conducted much of his business out of his bedroom, where he also stored his drugs. During transactions conducted in his bedroom, the .45 caliber gun was in evidence, and Gridley also carried the gun with him when he conducted drug business outside of his home. Gridley testified that he used his gun "for protection," but claimed that his need for protection was unrelated to his drug trafficking. For example, Gridley testified as follows on cross-examination:
 
 
 5
 Q: You knew you were involved in cocaine traffic[k]ing?
 
 
 6
 A: Yes, sir.
 
 
 7
 Q: Did you know people sometimes carry guns involved [sic] in cocaine traffic[k]ing?
 
 
 8
 A: Yes, sir, I suppose that is true.
 
 
 9
 Q: You carried that gun to protect yourself, right?
 
 
 10
 A: Yes, sir.
 
 
 11
 Q: And you indicated ... that if your life was threatened you would use your gun to protect your life?
 
 
 12
 A: Yes, sir.
 
 
 13
 Q: And if your life was threatened during a drug transaction you would have used that firearm to protect your life?
 
 
 14
 A: I can't envision that happening. I just wasn't involved to that extent.
 
 
 15
 Tr. at 99-100. In a second exchange, Gridley again denied any connection between his gun use and his drug trafficking:
 
 
 16
 Q: You felt you should have a handgun to protect yourself, correct?
 
 
 17
 A: If need be.
 
 
 18
 Q: It is better to have it and not need it than to need it and not have it?
 
 
 19
 A: That is correct.
 
 
 20
 Q: That is the philosophy you followed from the time you were 21 and got your gun permit?
 
 
 21
 A: Yes, sir.
 
 
 22
 Q: You felt it was better to have a gun and not need it than to need it and not have it?
 
 
 23
 A: Yes, sir. To me that was not in relation to the cocaine.
 
 
 24
 Q: You don't think your right--you have just as much right to carry a firearm while you are dealing cocaine as when you are not?
 
 
 25
 A: You have a right to defend your life, yes, sir.
 
 
 26
 Q: And if you need to defend your life during cocaine distribution you felt you had the constitutional right to do that?
 
 
 27
 A: Under a theoretical situation, yes. I have a right to defend my life. The cocaine was inconsequential to that.
 
 
 28
 Tr. at 100-01.
 
 
 29
 Judge Sharp found that the government adduced evidence sufficient to support a guilty verdict and sentenced Gridley to the mandatory five-year term. The statute provides that Gridley's sentence pursuant to section 924(c)(1) must run consecutive to the sentence for the underlying drug trafficking charge. Thus, Gridley received sixty months under the Guidelines for drug possession and conspiracy, and received an additional sixty months to be served consecutively under section 924(c)(1) for a total of 120 months confinement.
 
 II.
 
 30
 Gridley challenges his conviction on two grounds. Initially, he contends that there was insufficient evidence to support a finding that he carried or used the handgun in relation to drug trafficking. Thus, Gridley does not dispute that there was sufficient evidence to establish that he committed the drug trafficking crime charged, that he used or carried a firearm, and that he had knowledge of the facts constituting the crime under section 924(c). His argument is narrowly tailored, as he claims that the evidence was insufficient to find beyond a reasonable doubt that he used a firearm in conjunction with his admitted drug trafficking. His second challenge is that it was a violation of his right to due process for the prosecution to charge him separately with a violation of section 924(c) when the Sentencing Guidelines offered a provision under which he could have been punished for the same conduct with a significantly lower sentence.
 
 A.
 
 31
 Turning to the sufficiency of the evidence argument, we approach a challenge to a criminal conviction based on the sufficiency of the evidence by viewing the evidence and all reasonable inferences in the light most favorable to the government. United States v. Garrett, No. 89-1860, slip op. at 7 (7th Cir. May 31, 1990); United States v. Ocampo, 890 F.2d 1363, 1370 (7th Cir.1989). In addition, we will reverse a conviction only if no rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. Garrett, slip op. at 6; Ocampo, 890 F.2d at 1370. As we have noted on more than one occasion, these criteria impose a heavy burden on defendants who seek to challenge the evidentiary sufficiency of their convictions. United States v. Khorrami, 895 F.2d 1186, 1190 (7th Cir.1990); United States v. Nesbitt, 852 F.2d 1502, 1509 (7th Cir.1988), cert. denied, 109 S.Ct. 808 (1989).
 
 
 32
 Gridley argues that section 924(c) was intended to punish drug traffickers who use firearms as offensive weapons during drug trafficking. To support this proposition, the defendant relies on a selective reading of the case law. In United States v. Stewart, 779 F.2d 538 (9th Cir.1985), then-Judge Kennedy noted that the legislative history of the original version of the statute revealed that it was " 'directed at persons who chose to carry a firearm as an offensive weapon for a specific criminal act.' " Id. at 540 (quoting S.Rep. No. 225, 98th Congr., 1st Sess. 312-14 (1983), reprinted in 1984 U.S.Code Congr. & Admin.News 3182, 3492 n. 10). The statute was subsequently amended, however, and Stewart recognized that the statute's overall purpose, as amended, "was to impose more severe sanctions where firearms facilitated, or had the potential of facilitating, the commission of a felony." Id.
 
 
 33
 Defensive use of a weapon could clearly facilitate a drug trafficking crime. In this vein, the test set out in Stewart recognized that either offensive or defensive use of a firearm in relation to a drug trafficking crime is sufficient to constitute a violation of the statute:
 
 
 34
 If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred, then there is a violation of the statute.
 
 
 35
 Id. at 540.
 
 
 36
 Recently, this circuit held that using a gun for protection during drug trafficking was sufficient to constitute a violation of the statute. In United States v. Rosado, 866 F.2d 967 (7th Cir.), cert. denied, 110 S.Ct. 117 (1989), the defendant had a loaded gun in the pocket of a jacket that he took off and left in an open car thirty feet from where the drug transaction occurred. Noting that " '[w]eapons can be used for protection or intimidation and therefore facilitation of illegal transactions,' " id. at 970 (quoting United States v. LaGuardia, 774 F.2d 317, 321 (8th Cir.1985)), we concluded that the trial judge did not err in finding that the gun provided the defendant "with the security and confidence needed to undertake such a large cocaine transaction." Id.
 
 
 37
 Numerous other decisions also support the conclusion that the use of a firearm as a defensive weapon in drug trafficking violates section 924(c)(1). See, e.g., United States v. Raborn, 872 F.2d 589, 595 (5th Cir.1989) (defendant carried firearm "in furtherance of his traffic in drugs, a dangerous and illegal activity, to protect himself and to prevent hijacking of the drugs"); United States v. Poole, 878 F.2d 1389, 1394 (11th Cir.1989) (guns were used to protect house members and drugs); United States v. Robinson, 857 F.2d 1006, 1010 (5th Cir.1988) (defendant used firearm "as a means of safeguarding and facilitating illegal transactions and as an integral means of protecting his possession of cocaine"); United States v. Brockington, 849 F.2d 872, 876 (4th Cir.1988) ("[I]t is enough if the firearm is present for protection and to facilitate the likelihood of success, whether or not it is actually used."); United States v. Mason, 658 F.2d 1263, 1271 (9th Cir.1981) (defendants carried their guns to the drug deal to provide protection to a drug trafficker). Thus, Gridley's insistence that section 924(c) requires evidence of an offensive use of the firearm is unfounded.[4]
 
 
 38
 Next, Gridley attempts to avoid the inference that his gun use and his drug dealing were related by claiming that his drug transactions always occurred in a friendly atmosphere. However, it was not unreasonable for the trial judge to conclude that Gridley intended to use the gun to protect himself, his cocaine, and his drug proceeds should the need arise during the unpredictable and dangerous activity of drug trafficking. The court found that "the presence of a plainly visible and readily accessible loaded handgun--with a gla[s]er round in the chamber to boot-- ... 'emboldened' the defendant, allowing him to protect himself or intimidate others during his cocaine transactions." Thus, the trial judge concluded that "[a] reasonable inference can be drawn ... that the defendant strategically placed the handgun on his nightstand to not only protect himself but to protect the cocaine."
 
 
 39
 Gridley's counsel takes issue with the district court's inference on the ground that the only evidence linking Gridley's gun use and drug trafficking was the simple presence of the loaded gun in Gridley's bedroom. Counsel maintains that more evidence of the link between simple firearm possession and drug trafficking is necessary to support a conviction under section 924(c). In this case, however, there was more evidence: Gridley testified that he had used his firearm for protection while engaging in drug transactions in the past. Thus, the judge did not rest his inference solely on the presence of the loaded gun.
 
 
 40
 We do not agree with defendant's contention that the government must demonstrate that Gridley actually used the gun for protection--the judge could properly infer from the facts and circumstances of the case that Gridley intended to use the gun in this way. See Rosado, 866 F.2d at 969 (defendant need not actually brandish a firearm in order to "use" it for purposes of section 924(c)--intent to do so is sufficient); Ocampo, 890 F.2d at 1371 (same). We reiterated the point that evidence of intent, as opposed to evidence of actual use, was sufficient to sustain a conviction under section 924(c) in the recent case of United States v. Vasquez, No. 89-1908 (7th Cir. June 1990):
 
 
 41
 The evidence in Rosado established that the defendant wore a jacket containing the concealed weapon to a drug transaction, but that he removed the jacket and left it and the gun in his automobile when he conducted a drug transaction inside another vehicle a short distance away. We found that Congress did not intend that the statute be given a "cramped reading," [Rosado, 866 F.2d at 970], and that Rosado clearly used and carried the handgun during his drug trafficking offense. Id. at 969.
 
 
 42
 Lack of an opportunity to brandish or shoot his weapon did not mean that Rosado did not "use" the gun; nor does the fortuitous absence of a threatening occasion for Vasquez to sally forth with his arsenal rescue him from culpability under the statute. See id. at 969-970; United States v. Moore, 580 F.2d 360, 362 (9th Cir.), cert. denied, 439 U.S. 970 (1978)).
 
 
 43
 Id. at 8-9 (citations omitted).
 
 
 44
 In Vasquez, the loaded firearms were buried under packages of drugs in the trunk of a car inside a garage, yet "[t]he trier of fact could reasonably conclude that the availability of firearms instilled Vasquez with a heightened sense of security while he possessed the drugs with the intent to distribute them." Id. at 9. In Gridley's case, in contrast, the firearm was readily accessible, fully loaded, within reach on an adjacent nightstand, with the handle exposed and with a glaser round in the chamber. Gridley testified that he used his firearm for personal protection and had carried the gun with him on previous occasions when he conducted drug transactions. The inference that the weapon "emboldened" Gridley in the course of his drug trafficking or "instilled [him] with a heightened sense of security" was clearly supported by the evidence adduced at trial.
 
 
 45
 "This is not a case where a defendant is penalized for fortuitously ' "hav[ing] a gun in his possession when he commits an entirely unrelated offense." ' [Stewart, 779 F.2d at 539 (quoting Moore, 580 F.2d at 362) ]." Id. at 9. Gridley created a safety zone around himself whenever he carried or used his firearm; his drugs, his proceeds and his own well-being were within this zone of protection while he was a trafficking in drugs; his possession and/or use of the firearm during his drug trafficking, therefore, came within the purview of section 924(c).
 
 
 46
 Gridley's final challenge is that his use of guns for personal protection preceded his similar use of guns "during and in relation to [a] drug trafficking crime," and that therefore he is not subject to section 924(c). Gridley's earlier use is irrelevant to his current conviction so long as he did, in fact, use the gun in relation to his drug trafficking. Congress intended to criminalize this type of firearm use, and even if Gridley's earlier use was completely legal and appropriate, it does not mean that his later use was permissible under section 924(c).
 
 B.
 
 47
 Gridley next argues that the sentence he received under section 924(c) violated the due process clause because the same conduct could have been the basis of a modest upward departure under section 2D1.1(b)(1) of the Sentencing Guidelines. Under section 2D1.1, the sentencing judge increases the defendant's sentence by two offense levels if the defendant possessed a firearm during the commission of a drug offense. This two-level increase typically means an increase of twelve to fifteen months; conviction under section 924(c) carries a mandatory five year sentence to be served consecutively to any other sentence imposed for the underlying drug trafficking offense.[5]
 
 
 48
 Gridley's due process argument relies heavily on two district court decisions that are critical of the Sentencing Commission's derogation of judicial discretion in sentencing. In United States v. Curran, 724 F.Supp. 1239 (C.D.Ill.1989), the district court held that section 5K1.1 of the Guidelines was unconstitutional because it provided that only the government could make a motion for a downward departure on the grounds that the defendant provided substantial assistance. The court concluded that section 5K1.1 deprived the defendant of fundamental fairness because it limited his or her participation, as well as the court's, while providing the government with complete discretion in seeking what could be a well-deserved downward departure. This concern with prosecutorial discretion was also apparent in the second case Gridley relies on, United States v. Roberts, 726 F.Supp. 1359 (D.D.C.1989), which also condemned section 5K1.1 of the Guidelines.
 
 
 49
 Gridley's reliance on these two decisions is weakened by a recent holding of this court. In United States v. Lewis, 896 F.2d 246 (7th Cir.1990), this court held that section 5K1.1 did not violate the Constitution. We rejected the notion, which supported the section 5K1.1 attack, that the defendant was entitled to "an individualized sentence, imposed by a judge, and based upon consideration and weighing of all arguably relevant factors." Id. at 248. Congress, we concluded, had the power to proscribe sentencing discretion, and its decision (enacted through the Sentencing Commission's Guidelines) to vest the initiation of downward departure motions under section 5K1.1 in the government was not a violation of a defendant's due process rights.[6]
 
 
 50
 Gridley maintains, however, that the reasoning in Curran and Roberts continues to supply a valid attack on the legitimacy of his sentence. Essentially, Gridley argues that there is something fundamentally wrong with a scheme that allows a prosecutor to select from among various applicable statutes to arrive at one that provides a substantially greater sentence than the other(s). Yet, a similar argument was rejected by the Supreme Court in United States v. Batchelder, 442 U.S. 114 (1979). In Batchelder, the defendant's conduct fell into two overlapping criminal statutes, one providing a maximum fine of $5,000 and a maximum prison term of five years, while the other provided a maximum fine of $10,000 and a maximum prison term of two years. Batchelder was sentenced to five years under the first statute and argued that he should only have been subject to two years in prison.
 
 
 51
 In rejecting Batchelder's claim, Justice Marshall, writing for a unanimous Court, ruled that when "an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants."[7] Id. at 123-24. The Court rejected the argument that such prosecutorial discretion offends the Constitution.
 
 
 52
 [T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause. Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution[,] neither is he entitled to choose the penalty scheme under which he will be sentenced.
 
 
 53
 Id. at 125 (citations omitted).
 
 
 54
 Gridley attempts to avoid the holding in Batchelder by arguing that his case is factually distinguishable. He argues that the two statutes in Batchelder provided different maximum sentences and thus provided the sentencing judge with discretion to impose various fine/prison-term combinations within the statute selected by the prosecution. The statutory provisions in Gridley's case, by contrast, involve mandatory, fixed terms that the judge is required to impose. There is no possibility that the judge could temper the sentence requested by the prosecutor. Thus, Gridley concludes, the existence of mandatory terms, limited judicial sentencing discretion and unreviewable prosecutorial discretion combined to create de facto prosecutorial sentencing and thus violated the Constitution.
 
 
 55
 Gridley's argument attempts to establish a constitutional violation by combining three previously rejected constitutional attacks into a "new" theory of due process protection. However, if the existence and imposition of mandatory, fixed prison terms is permissible, see Lewis, 896 F.2d at 249; United States v. Bridgeman, 523 F.2d 1099, 1119 (D.C.Cir.1975) (reasoning that since Congress can validly impose minimum sentences, it may impose a mandatory sentence), cert. denied, 425 U.S. 961 (1976); and congressional restriction of judicial sentencing discretion is permissible, see Lewis, 896 F.2d at 249; United States v. Pinto, 875 F.2d 143, 145 (7th Cir.1989); and prosecutorial discretion in selecting a potentially applicable criminal statute is permissible, Batchelder, 442 U.S. at 125; United States v. Edwards, 814 F.2d 486, 490 (7th Cir.1987); then it is quite difficult to convince one that because all of these permissible events occurred in Gridley's case there was somehow a constitutional violation. Gridley provides no authority for his theory, and we have been unable to locate any in our own research.
 
 III.
 
 56
 Gridley's attacks on his conviction and sentence are rejected. We are convinced that sufficient evidence exists in the record on which the trial judge could properly find that Gridley committed the offense charged. Further, Gridley has failed to establish that his due process rights were violated when he was sentenced to a period of five years in prison under section 924(c) rather than receiving a shorter term via an upward departure under section 2D1.1 of the Sentencing Guidelines. The conviction and sentence in this case are
 
 
 57
 AFFIRMED.
 
 
 
 [1]
 Sometimes referred to as "safety rounds," the glaser bullet has a hollow tip, filled with small metal pellets. Upon impact, the bullet head bursts and the steel shot is scattered into the target. The glaser is called a "safety round" because there is no risk that this bullet will pass through a person or other target and hit someone or something else. For the same reason it is said to have considerably more "stopping power." The glaser is typically more expensive than standard "hard ball"-type bullets. Transcript at 20, 29, 37, 71
 
 
 [2]
 Hollow point bullets are similar to glaser bullets, but lack the steel shot. Instead of emptying shot into the target on impact, the tip of the hollow point "mushrooms" or flattens out upon impact and causes a larger area of the target to be destroyed than a simple steel ball-type bullet. Tr. 29, 37
 
 
 [3]
 The statute provides, in part, as follows:
 FNWhoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years....
 18 U.S.C. Sec. 924(c)(1).
 
 
 [4]
 In fact, in one line of cases, numerous firearms found in heavily guarded and protected "drug fortresses" are held to be "used in relation to" drug trafficking because they are presumed to provide protection to the drug traffickers who could anticipate a raid by rivals or police. See, e.g., United States v. Meggett, 875 F.2d 24, 29 (2d Cir.) ("[F]irearms ... were on hand to protect th[e] apartment as a storage and processing point for large quantities of narcotics and ... therefore the presence of weapons furthered or facilitated the narcotics operation and was an integral part thereof."), cert. denied, 110 S.Ct. 166 (1989); United States v. Matra, 841 F.2d 837, 842 (8th Cir.1988) ("Just as weapons are kept at the ready to protect military installations against potential enemy attack, so too may weapons be kept at the ready to protect a drug house, thereby safeguarding and facilitating illegal transactions."); United States v. Grant, 545 F.2d 1309, 1312 (2d Cir.1976) (defendant used firearms "as part of a tight security operation to protect large quantities of cocaine"), cert. denied, 429 U.S. 1103 (1977). The government in this case did not proceed on a drug fortress theory, thus no presumption was applied to Gridley's gun possession
 
 
 [5]
 Under section 2K2.4, the Guidelines provide that a defendant separately charged with violation of section 924(c) is not subject to the two level increase under section 2D1.1. See also United States v. Missick, 875 F.2d 1294, 1301 n. 7 (7th Cir.1989). From the record, it appears that section 2K2.4 was followed in Gridley's case--his offense level was not increased due to his use of a firearm during a drug offense
 
 
 [6]
 A number of other appellate courts agree. United States v. Francois, 889 F.2d 1341, 1344 (4th Cir.1989), cert. denied, 110 S.Ct. 1822 (1990); United States v. Grant, 886 F.2d 1513, 1514 (8th Cir.1989); United States v. Huerta, 878 F.2d 89, 94 (2d Cir.1989), cert. denied, 110 S.Ct. 845 (1990); United States v. Ayaraz, 874 F.2d 647, 653 (9th Cir.1989); United States v. Musser, 856 F.2d 1484, 1487 (11th Cir.1988), cert. denied, 109 S.Ct. 1145 (1989)
 
 
 [7]
 Gridley has not claimed that the prosecution in his case relied on discriminatory grounds in selecting the statute with the higher penalty provision